# EXHIBIT 1

ER

## COMMONWEALTH OF MASSACHUSETTS
## SUFFOLK COUNTY SUPERIOR COURT
## DEPARTMENT OF THE TRIAL COURT

| | |
|---|---|
| QUINN EMANUEL URQUHART & SULLIVAN, LLP, <br><br> Plaintiff, <br><br> v. <br><br> NANO DIMENSION LTD. and OFIR BAHARAV, <br><br> Defendants. | CIVIL ACTION NO. _____ <br><br> **COMPLAINT AND JURY DEMAND** |

## INTRODUCTION

1.      This action arises from a calculated campaign of corporate vengeance and predatory business tactics.  After losing a high-stakes legal battle in the Delaware Court of Chancery, Defendants Nano Dimension Ltd. ("Nano") and its CEO, Ofir Baharav, have weaponized their newly acquired control over Desktop Metal, Inc. ("Desktop Metal") to exact revenge against the attorneys who defeated them—Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel")— by orchestrating a scheme to avoid paying nearly $30 million in legal fees legitimately earned through what the Delaware Court described as "herculean" efforts.

2.      In January 2025, Desktop Metal retained Quinn Emanuel, one of the world's premier business litigation firms, to save the company from extinction.  Desktop Metal was facing a dire financial situation, rapidly burning through its remaining cash, while Nano—then its would-be acquirer—deliberately sabotaged regulatory approvals needed to close the merger agreement between the companies.  Desktop Metal's very survival hinged on forcing Nano to honor its contractual commitments.

3.      Through extraordinary effort and legal skill, Quinn Emanuel achieved the seemingly impossible.  In just three months, Quinn Emanuel assembled a compelling case

exposing Defendants' orchestrated plan to breach the merger agreement, conducted extensive discovery involving tens of thousands of documents and dozens of depositions, and secured a complete victory after a complex two-day trial. The Delaware Court of Chancery issued a decisive ruling compelling Nano to complete its acquisition of Desktop Metal, delivering Desktop Metal from the brink of bankruptcy.

4. For Defendants, however, this legal defeat was merely a temporary setback in a larger scheme. Long before the litigation, Mr. Baharav and his allies had openly advocated for a different strategy: let Desktop Metal "run out of cash completely" and then "buy the parts of it that are useful to Nano" in bankruptcy at pennies on the dollar. Now in control of Desktop Metal following the court-ordered acquisition, Defendants have reverted to this original plan with one vindictive addition—ensuring that Quinn Emanuel, the firm that thwarted their initial strategy, would not be paid for its services.

5. Defendants' conduct follows a disturbing pattern. When Murchinson Ltd., a Canadian hedge fund, gained control of Nano's board with Mr. Baharav as its nominee, it immediately purged Nano of executives and directors who supported the Desktop Metal merger, threatening them with frivolous lawsuits. Now under Nano's control, Desktop Metal is employing the same playbook of delay, deception, and sharp tactics against Quinn Emanuel that Nano previously deployed against Desktop Metal itself.

6. Despite having over $845 million in cash and cash equivalents, Nano has selectively provided financing to Desktop Metal to pay other creditors while specifically directing Desktop Metal not to pay Quinn Emanuel. Meanwhile, Defendants have launched a so-called "strategic review"—a thinly veiled process to strip Desktop Metal of valuable assets before an inevitable bankruptcy filing that will leave Quinn Emanuel and other creditors empty-handed.

7.      The brazenness of Defendants' scheme is remarkable.  In public statements, Mr. Baharav and Nano have transparently attempted to create a false record of Desktop Metal's "independence" while simultaneously exercising complete control over the company's operations, board, and financial decisions.  They have made misleading representations about Desktop Metal's intentions to pay Quinn Emanuel and its financial condition, all while steadfastly refusing to pay even a dollar of the fees owed or to provide any assurance of future payment.

8.      Through this lawsuit, Quinn Emanuel seeks to hold Defendants accountable for their tortious interference with Quinn Emanuel's contractual relationship with Desktop Metal and their unfair and deceptive business practices in violation of Massachusetts General Laws Chapter 93A.

## PARTIES

9.      Plaintiff Quinn Emanuel Urquhart & Sullivan, LLP is a California limited liability partnership engaged in the practice of law.  Quinn Emanuel maintains offices throughout the world, including in Boston, Massachusetts.

10.     Defendant Nano Dimension Ltd. is a corporation organized under the laws of Israel, with its principal place of business in Ness Ziona, Israel.  Nano does business in Massachusetts, including through its wholly-owned Massachusetts-based subsidiaries Desktop Metal and Nano Dimension USA Inc. and Massachusetts-based leadership.

11.     Defendant Ofir Baharav serves as the Chief Executive Officer of Nano and became the Chairman of Desktop Metal following Nano's acquisition of Desktop Metal.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to G.L. c. 212, § 3.

3

13.     This Court has personal jurisdiction over Defendants pursuant to G.L. c. 223A, § 3, because Defendants, directly and through their agents Desktop Metal and Nano Dimension USA Inc., transact business within the Commonwealth, have caused tortious injury by acts within the Commonwealth, and have caused tortious injury in the Commonwealth by acts outside the Commonwealth while regularly doing business and engaging in a persistent course of conduct in the Commonwealth.

14.     Venue is proper in Suffolk County pursuant to G.L. c. 223, § 1 and § 8 because Quinn Emanuel has an office in Suffolk County and, on information and belief, Mr. Baharav is presently living in Boston.[1]

## FACTUAL ALLEGATIONS

### I.     The Underlying Breach Of Contract[2]

#### A.     Desktop Metal's Merger Agreement With Nano

15.     Desktop Metal is a 3D printing company that was founded in 2015, went public in 2020, and, until recently, traded on the New York Stock Exchange.

16.     Desktop Metal is a major player in the industry.  It provides industrial-use 3D printers that create specialized parts for space travel, commercial flight, missile defense, and nuclear capabilities, and acquired 14 companies in or connected to the industry between 2019 and 2021.

---

[1]     *See* Nano Dimension, *2024 Results and 2025 Outlook: A Point of Transformation* (Apr. 30, 2025), https://perma.cc/QH77-PCWL (listing Mr. Baharav as being based in Boston).

[2]     The facts alleged in Part I are derived from the Delaware Court of Chancery's post-trial memorandum opinion in *Desktop Metal, Inc. v. Nano Dimension Ltd.*, No. 2024-1303-KSJM, 2025 WL 904521 (Del. Ch. Mar. 24, 2025).

17.     But Desktop Metal was burning cash, like almost all 3D printing companies at the time.  In late 2022, it began considering a sale of the company to take advantage of consolidation in the industry.

18.     Nano, a NASDAQ-listed Israeli company that designs and manufactures additive electronics, additive manufacturing 3D printing machines, and consumable materials, approached Desktop Metal about a possible acquisition in 2022, but negotiations reached an impasse.

19.     After another company, Stratasys Ltd., agreed to purchase Desktop Metal, Nano (Stratasys's largest stockholder) used its holdings to vote down the Stratasys-Desktop Metal merger.

20.     The day after blocking this merger, Nano began negotiating its own merger with Desktop Metal.

21.     Nano's due diligence revealed that Desktop Metal had a high cash burn rate; had accounts with high balances, long payment terms, and problematic inventory statuses; and had problems with slow-moving inventory.

22.     The parties negotiated an agreement (the "Merger Agreement") under which Nano would acquire Desktop Metal for approximately $183 million (about 30% of the Stratasys-Desktop Metal proposed merger from the prior year).  Desktop Metal's and Nano's boards were scheduled to meet on July 2 to approve the Merger Agreement.

23.     But Murchinson Ltd., a Canadian hedge fund and Nano's second largest stockholder, was opposed to Nano's acquisition strategy and launched a campaign to stop the Merger Agreement.  Nano sued Murchinson in Israeli court seeking to stop its anti–Merger Agreement campaign, fearing that, if Murchinson gained control of Nano, it would force Nano to

unwind the Desktop Metal deal.  Murchinson sent an open letter to all shareholders in late June stating its intention to oppose the deal and to appoint a new board that would unwind it.

24.     At the July 2 meeting, Murchinson urged the board to vote against the Merger Agreement.

25.     Murchinson's talking points at the board meeting were simple:  Desktop Metal "seems to be on the ropes" and Nano should "let it run out of cash completely and buy the parts of it that are useful to Nano" during the bankruptcy process.

26.     The board disagreed and approved the Merger Agreement.  Desktop Metal's board also approved it that day.

**B.     Nano's Bad Faith Breach Of The Merger Agreement**

27.     Murchinson was not willing to accept defeat.  It launched a proxy contest to take over Nano and to appoint a board that would breach the Merger Agreement.

28.     It nominated Mr. Baharav, a former Nano director, as one of its two candidates for the board, and propounded a stockholder proposal to disapprove of the Merger Agreement.

29.     As part of these efforts, Murchinson pressed to purchase Desktop Metal out of bankruptcy at 50 cents on the dollar.

30.     Mr. Baharav developed a slide deck arguing that the Nano board should have "negotiate[d] a structured Chapter 11" to acquire Desktop Metal, instead of executing the Merger Agreement.

31.     Murchinson continued to hammer this theme, telling another investor that the "Board had a lower cost route, structured ch. 11."

32.     Mr. Baharav sent multiple emails making clear that even if the deal closed, Nano should still pursue this bankruptcy approach ("if we buy why not do a structured chapter 11.").

33.     Mr. Baharav continued pressing this idea after he was elected Chairman of the board in December 2024.

34.     Mr. Baharav and Murchinson ultimately devised a bad-faith scheme to back out of the agreement: stonewall the regulatory approval process.  Because Desktop Metal's printers have military applications, the parties expected that the Merger Agreement would have to be reviewed and approved by the Committee on Foreign Investment in the United States ("CFIUS"), a committee that reviews foreign acquisitions of U.S. companies that have national security implications.  To mitigate the risk that CFIUS would block the merger, the Merger Agreement required Nano to cooperate with Desktop Metal to secure regulatory approvals, and also included a "hell or high water" clause requiring, in general, that Nano take all action necessary to obtain CFIUS approval.  The plan, as elucidated by Mr. Baharav, was to manipulate the CFIUS-process to ensure that the U.S. government would block the Merger Agreement.

35.     Murchinson began leaking to the press false conspiracy theories purporting to link Nano's management to Russian oligarchs, in the hopes that this would prompt CFIUS to block the Merger Agreement.

36.     Murchinson then acquired two seats on Nano's board and used its control to drag its feet in the CFIUS approval process.  It repeatedly delayed CFIUS requests to meet, took far too long to respond to CFIUS requests, and proposed redlines to draft agreements with CFIUS that increased risks to national security.

37.     Murchinson won its proxy election, and Mr. Baharav acted quickly, proposing an agenda to inquire into the CFIUS approval process and securing board approval to suspend the Merger Agreement.

38.     Murchinson then purged the board, threatening the six legacy directors it did not control with lawsuits unless they resigned (which they did on December 16).

39.     The Murchinson-controlled board then terminated Nano executives who supported the Merger Agreement, including its CEO and Chief Revenue Officer.

40.     The Delaware Court of Chancery found that "Murchinson's board nominees … acted as a unit in furtherance of Murchinson's goals," which were "to sabotage the Merger."

41.     Within weeks, Murchinson-dominated Nano began ghosting CFIUS requests for information and responses, ultimately ignoring CFIUS for 38 days.

42.     These bad-faith delays forced Desktop Metal to sue in the Delaware Court of Chancery for specific performance, so as to compel Nano to cooperate with the CFIUS process and take all steps necessary to close the Merger Agreement.

43.     Nano then invented excuses for not going through with the merger.  After initially filing an answer that alleged only that Desktop Metal had failed to provide Nano with requisite information, Nano eventually amended, asserting several new counterclaims alleging that Nano had violated covenants in the Merger Agreement.

44.     Nano also tried to win by default, opposing Desktop Metal's motion to expedite and later moving to relax the expedited schedule, so that there would be no time for the case to be tried before the March 31, 2025 closing date.

**C.     Desktop Metal's Retention Of Quinn Emanuel**

45.     But Desktop Metal had a problem.  The Merger Agreement (as amended) called for the deal to close by March 31, 2025, and Desktop Metal had sued in December.  That left virtually no time for any case—let alone a complex "busted deal" case involving novel CFIUS-review issues—to undergo discovery and trial and reach final resolution.

46.    And Desktop Metal needed the deal to close.  Desktop Metal was by then losing so much cash that, unless the closing went forward, it risked bankruptcy.  In Q2 and Q3 2024 SEC filings, Desktop Metal warned that it was "probable" that it would "be unable to meet its obligations as they become due within one year," and, in early 2025, discussed bankruptcy with outside counsel.

47.    Desktop Metal accordingly turned to Quinn Emanuel, the world's leading litigation firm with singular experience in "busted deal" cases, to represent it in its "bet-the-company" case against Nano.

48.    In January 2025 Quinn Emanuel and Desktop Metal entered into a contract (the "Engagement Letter") pursuant to which Quinn Emanuel agreed to represent Desktop Metal in litigation against Nano in the Delaware Court of Chancery.  In exchange, Desktop Metal agreed to pay Quinn Emanuel's fees and costs for its representation.

49.    Quinn Emanuel offered Desktop Metal an extremely generous deal and shouldered much of the risk in the case itself.

50.    The Engagement Letter provided that Quinn Emanuel would bill Desktop Metal at 50% of its normal hourly rates, but that if Quinn Emanuel succeeded in obtaining "a court order that requires or facilitates the closing of the transaction between [Desktop Metal] and the Nano parties" or any resolution that "achieves the same result," Desktop Metal would pay Quinn Emanuel 120% of its normal hourly rates.  The Engagement Letter disclosed the full range of its hourly rates, which did not change over the course of Quinn Emanuel's three-month representation.  The Engagement Letter also provided that Quinn Emanuel would not charge Desktop Metal for the first $150,000 in fees it incurred in the case.

51.    Desktop Metal also agreed to pay all outside vendors that Quinn Emanuel retained in the case directly, and that Quinn Emanuel would not be responsible for those costs.

52.    The Engagement Letter required that "[a]ll bills [] be paid within thirty days of receipt."

53.    The Engagement Letter also stated that Quinn Emanuel intended to "submit bills on a monthly basis."

54.    After the Engagement Letter was signed, however, Desktop Metal's General Counsel (whom Desktop Metal had designated to manage its relationship with Quinn Emanuel) informed Quinn Emanuel that it should not send its bills on a monthly basis. Given the speed at which the case was proceeding, Desktop Metal explained, it did not have time to review Quinn Emanuel's invoices. Quinn Emanuel and Desktop Metal therefore agreed that Quinn Emanuel would provide timely updates to Desktop Metal of the total fees and costs incurred to date, and that Quinn Emanuel would provide the full, detailed set of invoices after the trial concluded.

55.    Consistent with this instruction, Quinn Emanuel (which had started working on the case in mid-January) provided Desktop Metal with notice of its January fees on February 26 and notice of its February fees on March 6.

56.    Quinn Emanuel sent detailed invoices to Desktop Metal for January, February, and March through March 26 on March 31. On April 4, Quinn Emanuel sent its final invoice to Desktop Metal for the final days of March.

### D.    Quinn Emanuel's "Herculean" Win For Desktop Metal

57.    Quinn Emanuel devoted substantial resources to the case, working night and day to prepare for and try the case in the three months between filing and final judgment.

58.    Twenty-seven attorneys, ranging from first year associates to managing partners, contributed.

10

59.     During that time, Quinn Emanuel's team (i) produced tens of thousands of documents; (ii) took and defended 22 depositions; (iii) briefed several motions; (iv) met or communicated near-daily with Desktop Metal to develop and implement various litigation strategies; and (v) conducted a two-day trial, where the record comprised 2,620 trial exhibits, live testimony from seven fact and four expert witnesses, deposition testimony from eleven fact and nine expert witnesses, and 47 stipulations of fact.

60.     On March 24, 2025, the Delaware Court of Chancery found that Nano had engaged in a deliberate campaign to delay, obstruct, and avoid closing the merger, in breach of its obligations under the contract, and ordered Nano to complete the transaction. The court called Quinn Emanuel's efforts "herculean."

61.     Quinn Emanuel's representation was widely praised, both by Desktop Metal and by the trade press. Several of its lead attorneys were recognized by Law.com as "Litigators of the Week."

62.     The merger between Desktop Metal and Nano closed on April 2, 2025, with Desktop Metal becoming a wholly-owned subsidiary of Nano.

## II.     Nano Blocks Desktop Metal From Paying Quinn Emanuel's Bills

### A.     Desktop Metal's Use Of Delays And Deception To Avoid Payment

63.     Precisely because of this success and what it had learned during trial about the Murchinson-controlled Nano and Mr. Baharav's cavalier attitude towards contracts and history of bad faith, Quinn Emanuel became concerned that, after the deal closed, Nano and Mr. Baharav would, out of spite towards the firm that defeated them, use their control over Desktop Metal to block it from paying Quinn Emanuel and its vendors. This was, after all, the same playbook that Murchinson, which controlled Mr. Bharav and Nano, had employed when it wanted to stop the

Merger Agreement: Take over the company, and disavow its contracts. And Murchinson and Mr. Baharav had made clear their intention to bankrupt Desktop Metal, even if the deal closed. The risk was palpable that Nano would loot Desktop Metal for whatever assets it could find, force an asset-stripped Desktop Metal into bankruptcy, buy whatever assets remained at bargain prices, and leave Desktop Metal's creditors almost entirely empty-handed.

64. Accordingly, before the merger closed, Desktop Metal (represented by Quinn Emanuel) moved for the Delaware Court of Chancery to vacate a covenant in the Merger Agreement prohibiting Desktop Metal from taking on additional liabilities, so as to allow Desktop Metal to pay Quinn Emanuel before Nano took over. In the alternative, Desktop Metal asked for the Court of Chancery to shift fees to Nano. The Delaware Court of Chancery denied both requests, finding that it could not vacate a covenant in the merger agreement simply to pay Desktop Metal's attorneys, and that the American Rule barred fee-shifting against the losing party.

65. True to form, the Nano-controlled Desktop Metal reverted to Murchinson and Nano's old tricks that they had previously employed against Desktop Metal: delay, deception, and sharp tactics.

66. On April 3, following the closing of the merger, Quinn Emanuel sent a letter to both Desktop Metal and Nano requesting immediate confirmation that Quinn Emanuel's bills would be paid in full. Neither company responded.

67. So Quinn Emanuel, following the terms of its Engagement Letter, submitted a notice of arbitration against Desktop Metal (but not Nano or Mr. Baharav) to JAMS on April 10, seeking $29,798,725.61, plus interest thereon, and its costs, fees and expenses incurred in connection with the arbitration. Quinn Emanuel later amended its claim in the arbitration to reflect that its bill had come due and that Desktop Metal had failed to pay. Just as Murchinson-dominated

Nano had done in Delaware, Murchinson- and Nano-dominated Desktop Metal refused to expedite the JAMS arbitration, precluding any prompt resolution of the matter.

68.    On April 11, Quinn Emanuel petitioned the New York Supreme Court for an attachment of Desktop Metal's assets in aid of arbitration.  As a courtesy to its former client, Quinn Emanuel gave Desktop Metal approximately 12 hours' notice before it filed, and contemporaneously served copies of the papers on Desktop Metal.  Following a hearing, the court issued an order denying Quinn Emanuel's motion for an attachment largely based on its belief that the case was not ripe because Desktop Metal was not required to pay Quinn Emanuel's fees until April 30 (30 days after Quinn Emanuel presented its invoice).  Quinn Emanuel had argued that Desktop Metal had repudiated its payment obligations, but the court disagreed.  It credited Desktop Metal's assurances that it had not repudiated the agreement but was simply taking the time to review the invoices.  Quinn Emanuel had argued that, under New York law, Desktop Metal's failure to provide assurances of its intention to pay constituted a repudiation because Desktop Metal was insolvent, but the court again disagreed, crediting Desktop Metal's assurances and intimations that it was *not* insolvent.[3]

69.    April 30 came and went and Desktop Metal still has not paid Quinn Emanuel even a dollar of the fees owed.

70.    Desktop Metal has not conveyed to Quinn Emanuel that it intends to pay any part of the bill either.

71.    Nor has Desktop Metal identified any dispute that it has with Quinn Emanuel's bills.

---

[3]    Quinn Emanuel has appealed the trial court's decision and, now that the bills are undisputedly due, brought a new attachment application against Desktop Metal.  Both the appeal and the application are pending.

72.     The only thing Desktop Metal told Quinn Emanuel since the bills became due is that it would seek sanctions if Quinn Emanuel sought another attachment.

73.     It is clear now that Desktop Metal's earlier representations relied on a series of half-truths and deceptive omissions.

74.     For example, to avoid attachment, Desktop Metal heavily implied, without saying outright, that it was a financially solvent company, and argued in an April 30 filing that Quinn Emanuel's evidence to the contrary was wanting.  This was deeply misleading:  Just hours earlier, Nano's CFO had said on a conference call (which he hosted with Mr. Baharav) that "Desktop Metal does not now have the liquidity or financing commitments necessary to … satisfy [] material liabilities" due this summer.  Nano Dimension Ltd. (NNDM) Q4 2024 Earnings Call Transcript, Seeking Alpha (Apr. 30, 2025, 10:34 p.m. ET), https://tinyurl.com/2rca46xw.

75.     Desktop Metal's intimations that it was considering payment and intended to pay on the April 30 due date—which it used to avoid an attachment—were also untrue.  The new Nano-controlled Desktop Metal never intended to pay Quinn Emanuel; it claimed otherwise only to buy time for Nano to take stock of Desktop Metal's assets, at which point, Desktop Metal would declare bankruptcy.

**B.     Nano's Interference In Desktop Metal's Contract With Quinn Emanuel**

76.     Quinn Emanuel got to know Desktop Metal and its officers well during the several months it represented it.  None of the above delays and deceptive acts are anything like how Desktop Metal used to conduct its business.  Instead, it has become clear that Nano and Mr. Baharav, who resigned as Chairman to become Nano's CEO just days after the merger closed, are using their power over Desktop Metal to direct it not to pay Quinn Emanuel's bills.

14

77.     Desktop Metal's actions make no sense otherwise.  A rational company seeking to protect its bottom line and act in good faith would not act this way.  It would seek to negotiate a discount, identify areas of concern (if any) with the bill, devise payment plans, and so on.  Stiffing lawyers indefinitely, while misleading courts about how you are actually reviewing their bills and intend to pay them soon, is not a long-term strategy for success.

78.     Instead, this is the modus operandi that Murchinson, Nano, and Mr. Baharav employ.  Nano dragged its feet and breached its contract with Desktop Metal (just like Desktop Metal is doing to Quinn Emanuel now).  Murchinson and Mr. Baharav seized control of Nano and forced it to execute this strategy, while eliminating all dissenters (just as Nano, under their direction, seized control of Desktop Metal).

79.     In the New York proceedings, Desktop Metal told the courts that the reason it has not paid Quinn Emanuel yet is because "the new owners of Desktop Metal had to step in and attempt to understand the invoices, examine them, and raise any issues."  This is a concession that Nano and its CEO, Mr. Baharav, have directed Desktop Metal not to pay.

80.     More generally, Nano is in full control of Desktop Metal.  It has 100% ownership of the company, has complete control over the board (stating in the investor call that Desktop Metal has just one independent board member), and appointed Mr. Baharav "to drive" "swiftly" Desktop Metal's integration with Nano.  Mr. Baharav reported in Nano's April 30 conference call (which he joined from Boston) that he "spent the last several weeks visiting" all of Nano's facilities, as well as those of Desktop Metal, and that Nano is applying a "disciplined investment approach to Desktop Metal."  Nano's CFO disclosed on the same call that Nano had provided "limited secured financing to Desktop Metal to help address its short-term liquidity needs and allow it to run its strategic process."

81.     On information and belief, Nano has appointed Mr. Baharav to Desktop Metal's board to facilitate these efforts and cement its control over Desktop Metal.

82.     Nano is also paying and controlling Desktop Metal's lawyers in the JAMS and New York attachment proceedings.

83.     This has led to potential conflicts of interest:  Desktop Metal has argued, for example, not only that the New York courts should decline to attach Desktop Metal's assets, but also that, if the court does attach those assets, it should spare Desktop Metal's subsidiaries and corporate parent, Nano.  These are arguments—which are extraneous because Quinn Emanuel has never sought attachment of Nano's or the Desktop Metal subsidiaries' assets—that a corporate parent would push its subsidiary to make to protect the parent's interest, not ones that a company focused on protecting itself would make.

84.     Nano and Mr. Baharav have tried to cover up their plain control over Desktop Metal in their public communications with investors.  When asked during the April 30 investor call about Desktop Metal's value as a company, Mr. Baharav emphasized Desktop Metal's "independence," and claimed that Desktop Metal was running its "own process" to review its financial state.  Nano's CFO likewise went out of his way to emphasize that Desktop Metal's review of its financial state— which, to be clear, *Nano* (not Desktop Metal) announced—is "independent."

85.     These references to Desktop Metal's "independence" are deceptive, heavily coached, and designed for one purpose only: To create a record to defeat any claim that Nano could be held liable for Desktop Metal's liabilities.  Indeed, in the same breath that Nano's CFO referred to Desktop Metal's independence, he also made sure to emphasize that all of Desktop Metal's liabilities are "obligations of Desktop Metal, not Nano."

### C.     Nano's And Mr. Baharav's Wrongful Motive And Wrongful Acts

86.     Nano and Mr. Baharav have no good-faith basis for directing Desktop Metal not to pay Quinn Emanuel.

87.     They are not parties to the original contract with Quinn Emanuel and thus do not stand to gain directly from Desktop Metal's nonpayment.

88.     Nano has also provided Desktop Metal financing to run its business and pay its other creditors, just not Quinn Emanuel.

89.     Nano can afford to lend Desktop Metal plenty more:  According to its April 30 financials, Nano is sitting on $845 million in cash and cash equivalents.

90.     Mr. Baharav has a fiduciary duty to Desktop Metal.

91.     But Nano and Mr. Baharav are directing Desktop Metal out of a desire to retaliate against Quinn Emanuel for beating Nano at trial, and because they intend to follow through on Murchinson and Mr. Baharav's original plan:  Drive Desktop Metal into bankruptcy, scoop up any assets Nano has not yet plundered at rock-bottom prices, and leave creditors with next to nothing.

92.     Retaliation is how Nano's new owners do business.  They celebrated their corporate coup by purging Nano of everyone who ever supported the Desktop Metal merger, including by threatening independent directors with frivolous suits to force them to resign.  Now Desktop Metal, under Nano's direction, is refusing to pay Quinn Emanuel's bills because it compelled Nano to undertake a purchase it did not want, and is making frivolous sanctions threats if Quinn Emanuel sues it again.

93.     Defendants have also always intended to strip Desktop Metal of useful assets.  At a June 2, 2024 meeting of Nano's Board of Directors, Defendants discussed their strategy to acquire Desktop Metal.  During this meeting, as reflected in the minutes, Nano acknowledged that

despite Desktop Metal's "negative cash flow, it holds a portfolio of companies, and thus offers a unique multi-dimensional M&A opportunity, including by ways of potential multiple combinations, synergies, spin-offs, and other divestments."

94.     In the Delaware proceeding, Nano's former CEO testified that he anticipated that, after Desktop Metal was acquired, it would divest itself of many of the businesses it had acquired during its acquisition phase (whose assets Desktop Metal is now urging the New York courts not to attach).

95.     Nano's current president likewise testified that, in promising synergies between Desktop Metal and Nano's business, it was promising to consolidate the facilities and business lines between Desktop Metal and Nano.  He also testified that "there is no such thing as Desktop employees after the merger, we will be one company."

96.     Mr. Baharav agreed in his trial testimony:  "The entire premise behind this deal was consolidation in the space, and consolidation also means synergies in product and synergies in manufacturing facilities.  And our ability to first consolidate and then potentially move manufacturing facilities into lower-cost regions so that we could be competitive with products that are coming from lower-cost regions and are nibbling at our market share is paramount."

97.     After acquiring Desktop Metal, Nano issued a press release discussing its plans for "identifying immediate cost synergies, and strategically realigning resources toward our highest-potential product lines."

98.     Upon information and belief, consolidation—meaning transferring Desktop Metal assets to Nano—is the very purpose of Desktop Metal's purported strategic review process.  Nano and Desktop Metal do not need several months to review and consider Desktop Metal's financial condition:  Whether Desktop Metal is solvent was the primary issue in the Delaware Court of

Chancery, and one with which Nano is very familiar. Upon information and belief, the point of the review process instead is to give Nano time to divest Desktop Metal of choice assets to further its goal of integrating Desktop Metal's technology into Nano.

99.     After the review process is over, there is no question that Desktop Metal will declare bankruptcy.

100.     Quinn Emanuel raised this concern several times in the New York proceedings, and Desktop Metal did not deny that it intended to declare bankruptcy soon.

101.     The Delaware Court of Chancery also made several findings that suggest Desktop Metal may soon have to declare bankruptcy. Among other things, "as 2024 was closing out, Desktop [Metal] was struggling to stay on top of its bills," and as of February 2025, "Desktop[] [Metal's] 'unrestricted cash ha[d] been completely depleted,'" leaving Desktop Metal with "approximately $10 million total cash remaining (including restricted cash)." On the whole, it was "undeniable that Desktop [Metal] [was] extremely cash strapped." "[O]perating the company became 'increasingly challenging' as its cash balance fell below $10 million, which it did by December 2024." And all the while, Desktop Metal "acknowledged that [the] 'risks' [of bankruptcy] were 'escalating weekly.'" "It was a dire situation, as Desktop projected. This is why Desktop emphasized speed when negotiating the Merger Agreement …."

102.     On April 21, moreover, Nano announced that Desktop Metal had appointed a bankruptcy specialist to its board, hired two firms specializing in bankruptcy, and had "commenced a process to explore all available strategic alternatives to address its liabilities and liquidity needs"—a euphemism for bankruptcy.

103.     On April 30, Nano made this even clearer, with its CFO announcing that "Desktop Metal does not now have the liquidity or financing commitments necessary to make [a June]

repurchase [of outstanding convertible notes] or satisfy other material liabilities," and repeated that Desktop Metal was running a "process to evaluate all of its available strategic alternatives to address its liabilities and liquidity needs."

104.    Also during the April 30 call, when asked whether Nano had found any "value" in the Desktop Metal purchase or whether it intended to sell the assets, Mr. Baharav responded, "Desktop Metal has limited liquidity and significant liabilities.  So that's something that should be called out…. They have their own independent director and they have their own advisers, trying to work through this process. Ultimately, we have to respect that process, maintain its independence and we're waiting to see the results and see where we'll go from there and where they'll go from there."

105.    The implication of Mr. Baharav's statements is that he expects Desktop Metal to wind up in bankruptcy, where he will be able to finally execute his plan to snap up its assets at bargain prices.

## CAUSES OF ACTION

### COUNT I
### (Tortious Interference With Contractual Relations)

106.    Quinn Emanuel repeats and realleges the allegations contained in paragraphs 1 through 105 as if fully set forth herein.

107.    A valid and enforceable contract exists between Quinn Emanuel and Desktop Metal in the form of the Engagement Letter dated January 10, 2025.

108.    Defendants knew of the existence of this contractual relationship.  Defendants were aware that Quinn Emanuel had successfully represented Desktop Metal in litigation against Nano and that Desktop Metal was contractually obligated to pay Quinn Emanuel for these services.

109.    Defendants intentionally induced Desktop Metal to breach its contract with Quinn Emanuel by refusing to pay Quinn Emanuel's bills, while simultaneously stripping Desktop Metal of its assets, rendering it insolvent, and preparing to potentially file for bankruptcy.

110.    Defendants' intentional interference was improper in motive and means.  Their interference was motivated by malice and a desire to retaliate against Quinn Emanuel for its successful representation of Desktop Metal against Nano, and was executed through improper means, including, on information and belief, potentially fraudulent transfers of Desktop Metal's assets to Nano, and other Nano-controlled entities for less than fair value.

111.    As a direct and proximate result of Defendants' tortious interference, Quinn Emanuel has suffered and continues to suffer damages in an amount to be determined at trial, but in no event less than $30 million, representing the unpaid legal fees and costs that Desktop Metal is contractually obligated to pay Quinn Emanuel.

## COUNT II
### (Unfair and Deceptive Trade Practices)

112.    Quinn Emanuel repeats and realleges the allegations contained in paragraphs 1 through 111 as if fully set forth herein.

113.    At all relevant times, Defendants were engaged in trade or commerce within the meaning of G.L. c. 93A, § 11.

114.    Defendants' conduct as alleged herein constitutes unfair and deceptive acts or practices in the conduct of trade or commerce in violation of G.L. c. 93A, § 11.

115.    Such unfair and deceptive acts or practices include, but are not limited to:

    a.    Intentionally directing Desktop Metal not to pay Quinn Emanuel's invoices despite Desktop Metal's contractual obligations to do so;

b.  Engaging in a coordinated scheme to avoid Desktop Metal's legitimate business obligations to Quinn Emanuel while simultaneously maintaining control over Desktop Metal's remaining assets;

c.  Retaliating against Quinn Emanuel for its successful representation of Desktop Metal in litigation against Nano;

d.  Using Nano's control over Desktop Metal to advance a premeditated plan to bankrupt Desktop Metal, a Massachusetts company, and acquire its assets at artificially depressed prices, while leaving creditors like Quinn Emanuel unpaid; and

e.  On information and belief, stripping Desktop Metal of valuable assets while directing Desktop Metal to evade its payment obligations to Quinn Emanuel.

116.  Defendants' unfair and deceptive acts or practices occurred primarily and substantially within the Commonwealth of Massachusetts, where Mr. Baharav is conducting business on behalf of Nano and Desktop Metal, where Desktop Metal maintains operations, and where Nano does business through its wholly-owned Massachusetts subsidiaries.

117.  As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Quinn Emanuel has suffered and continues to suffer a loss of money in an amount to be determined at trial, but in no event less than $30 million.

118.  Defendants' violations of G.L. c. 93A were willful and knowing, thereby entitling Quinn Emanuel to multiple damages (including up to treble damages) and attorneys' fees and costs pursuant to G.L. c. 93A, § 11.

## PRAYER FOR RELIEF

WHEREFORE, Quinn Emanuel respectfully requests that this Court:

A.      Enter judgment in favor of Quinn Emanuel on its claim for tortious interference with contractual relations;

B.      Award Quinn Emanuel compensatory damages in an amount to be determined at trial, but in no event less than $30 million;

C.      Award Quinn Emanuel treble damages;

D.      Award Quinn Emanuel pre-judgment and post-judgment interest as permitted by law;

E.      Award Quinn Emanuel its costs and reasonable attorneys' fees incurred in connection with this action; and

F.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

DATED:      July 8, 2025                    Respectfully submitted,

*/s/ William D. Weinreb*
William D. Weinreb (BBO # 557826)
Alex H. Loomis (BBO # 699129)
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
billweinreb@quinnemanuel.com
alexloomis@quinnemanuel.com

Kevin S. Reed (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, NY 10016
(212) 849-7000
kevinreed@quinnemanuel.com

23